T.C. Memo. 1998-449


UNITED STATES TAX COURT


ROBERT M. AND PAULETTE G. MADDOX, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 20959-96.                    Filed December 23, 1998.


        Respondent disallowed substantially all of petitioners'
claimed deductions.  The parties settled, with respondent
conceding about 97 percent of the disallowed deductions for
1 year and about 91 percent for the other year, and
conceding that there were no deficiencies for either year.
Respondent's position when filing the answer in the instant
case was based on respondent's not yet having received
substantiation for the disallowed deductions.

        <u>Held</u>:  On the facts, respondent was primarily
responsible for the substantiation not having been provided
by the time respondent filed the answer, and so respondent's
position was not "substantially justified."  Sec.
7430(c)(4)(B)(i), I.R.C. 1986.  Stipulated amount of
litigation costs awarded.


<u>Daniel W. Schreimann</u>, for petitioners.

<u>James E. Archie</u>, for respondent.

MEMORANDUM OPINION

CHABOT, <u>Judge</u>: This matter is before us on petitioners' motion for an award of litigation costs[1] pursuant to section 7430[2] and Rule 231.[3]

The issue for decision is whether respondent's position in the instant case was substantially justified, within the meaning of section 7430(c)(4)(B)(i).

Neither side has requested a hearing, and we conclude that a hearing is not necessary. Rule 232(a). Accordingly, we decide petitioners' motion on the basis of the parties' stipulations, stipulated exhibits, and briefs filed in connection with petitioners' motion, and the other documents in the Court's record in the instant case.

---

[1] Although petitioners refer to "administrative" costs at a few places in their brief, it is evident from the language in their motion and from the exhibit describing their counsel's work that their motion does not deal with costs paid or incurred before their counsel began to work on the petition herein. From the foregoing, we conclude that petitioners' references to administrative costs are inadvertent and that our proceedings relate only to litigation costs.

[2] Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1986, as in effect for the years in issue. References to sec. 7430 are to that section as in effect for proceedings commenced at the time the petition in the instant case was filed. Because the petition was filed on Sept. 26, 1996, the amendments made by title VII of the Taxpayer Bill of Rights 2, Pub. L. 104-168, sec. 701, 110 Stat. 1452, 1463 (1996), effective after July 30, 1996, apply to the instant case. See <u>Maggie Management Co. v. Commissioner</u>, 108 T.C. 430, 438-441 (1997).

[3] Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice and Procedure.

Respondent determined deficiencies in Federal individual income tax and additions to tax under section 6662 (accuracy-related) against petitioners as follows:

| Year | Deficiency | Additions to Tax Sec. 6662 |
|------|------------|----------------------------|
| 1991 | $356,117 | $71,223 |
| 1992 | 470,966 | 94,193 |

## Background

When the petition was filed in the instant case, petitioners Robert M. Maddox (hereinafter sometimes referred to as Robert) and Paulette G. Maddox (hereinafter sometimes referred to as Paulette), husband and wife, resided in El Paso, Texas.

### Businesses

Robert is an ophthalmologist with a medical practice in El Paso, Texas. In 1991, Robert opened another ophthalmology office in Juarez, Mexico, which allowed him to perform a type of laser eye surgery that was not permitted in the United States at that time.

Robert had extensive business interests in addition to his medical practice. He was the sole shareholder of several S corporations, some of which related to his medical practice. Others involved a restaurant, a farm, and real estate interests.

### El Paso to Dallas

Petitioners filed individual income tax returns for 1991 and 1992. The tax returns were mailed, in accordance with extensions

for filing, on October 15, 1992, and October 15, 1993, respectively, and were received at the Austin, Texas, Service Center on October 19, 1992, and October 18, 1993, respectively.

In October 1994, a revenue agent with the IRS office in El Paso telephoned petitioners and indicated that there would be an examination of petitioners' 1991 and 1992 tax returns.

On November 14, 1994, petitioners' representative wrote to the revenue agent, asking that the location of the examination be transferred to Dallas, Texas. Petitioners' representative stated that his office is in Dallas and that he "has all of the books, records, and source documents that will be necessary to complete a 1991 and 1992 examination." The revenue agent did not send correspondence to petitioners identifying specific matters to be addressed in the examination.

In connection with the transfer of the examination and related files to Dallas, the revenue agent asked petitioners to consent to extending to June 30, 1996, the period of limitations for assessment of 1991 income tax. To accomplish this, a Form 872 was executed by petitioners' representative on December 20, 1994, by petitioners on December 21, 1994, and by respondent on January 5, 1995. The period of limitations date for 1992 remained October 15, 1996.

The IRS administrative files relating to 1991 and 1992 were transferred from El Paso on January 20, 1995, and received in the Dallas IRS office on February 10, 1995. The responsibility for

examining petitioners' income tax returns was assigned to Dallas IRS Examination Group 1432 on February 16, 1995. There remained 16½ months before the limitations period for 1991 would expire.

In mid-December 1995, a revenue agent in Dallas saw the administrative files for petitioners' case, together with those for 16 other cases, in the bottom of an extra file cabinet outside the acting manager's office. There remained 6½ months before the limitations period for 1991 would expire.

Finally, on April 17, 1996, petitioners' case was assigned by the acting manager to a revenue agent, Julie Ward, hereinafter sometimes referred to as Ward. Ward's manager instructed her to secure extensions of the limitations periods and, if she could not do so, then she was to "write-up and disallow issues and send to 90-Day." There remained 10½ weeks before the limitations period for 1991 would expire.

The April 23, 1996, Meeting

On April 18, 1996, Ward telephoned petitioners' representative, and left a message in order to set up a meeting. She called again on April 19. Petitioners' representative returned the April 19 telephone call, but Ward was not available. Ward left another message for petitioners' representative that afternoon.

Ward finally reached petitioners' representative by telephone on April 22, and asked for extensions of the limitations periods. Petitioners' representative expressed

reluctance, because he had already consented to one extension and he believed the tax returns were "clean". Ward and petitioners' representative arranged an appointment for the afternoon of April 23, 1996, at petitioners' representative's office. This telephone call was the first contact by IRS personnel with petitioners or petitioners' representative regarding petitioners' tax returns since the time that the administrative files had been transferred to Dallas. During the April 23, 1996, meeting, petitioners' representative and Ward conducted the initial examination and reviewed petitioners' tax returns. For 2 hours, Ward asked petitioners' representative numerous questions relating to petitioners' multiple business interests. Petitioners' representative's responses to Ward's questions were as follows:

Schedule E:  Curie Building, Galveston House

The Curie Building is an office building owned by Paulette. It was purchased in 1987 and petitioners are personally liable on the note obtained to finance the purchase.

Petitioners also owned a rental house in Galveston, Texas. Paulette inherited the house and allowed her sister to live there.

Petitioners' S Corporations

Robert owned 100 percent of four S corporations, as follows:

### Eye Pharmacy, Inc.

This business was established to distribute eye medicines. The business was operated out of the Curie Building. The last year of operations was 1991, for which the corporation earned $2,000. By the time of the April 23, 1996, meeting, there were no assets, the corporation's organization costs were written off, and the cash was remitted to Robert Maddox, M.D., P.A.

### Casa Sabrosa, Inc.

This corporation operated a Mexican restaurant in the Curie Building. It was operated by a restaurant manager during the business hours of the Curie Building's tenants. The restaurant did not pay any rent to petitioners. The corporation's operation of the Mexican restaurant ended in 1991. As of the April 23, 1996, meeting that space in the Curie Building was being used as an employee cafeteria for Robert Maddox, M.D., P.A.

### Maddox Optical, Inc.

This corporation was still active at the time of the April 23, 1996, meeting. Its primary purpose is the production of eyeware, such as glasses and contact lenses. The corporation leases 4,000 square feet of space in the Curie Building. It earns about $200,000 per year in gross receipts.

<u>Robert Maddox, M.D., P.A.</u>

Robert Maddox, M.D., P.A., operates the El Paso office of Robert's medical practice. The corporation employed a staff of about 75 people and at one time had 2 optometrists and 1 medical doctor on staff. At the time of the April 23, 1996, meeting, Robert was an employee of the corporation. This corporation also operates out of the Curie Building.

<u>Schedule C</u>

Robert Maddox, M.D., P.A., was Robert's Schedule C laser surgery practice, which had its office in Juarez, Mexico. The practice was started in 1990 in order to allow Robert to perform laser eye surgery using a certain type of machine. This procedure was not then approved in the United States. (It was first approved in the United States in October 1995.)

In order to determine whether this type of surgery was warranted in a specific case, Robert examined patients in his El Paso office, which was operated by Robert Maddox, M.D., P.A. If surgery was warranted, then Robert transported the patient across the border to Juarez to perform the surgery. Robert had one surgical nurse, named Maria, assisting him with the operations. Petitioners' representative did not know Maria's surname.

While this particular surgical procedure had been approved in Mexico, the Mexican Government imposed restrictions on the procedure until December 1991. Robert incurred legal fees

associated with these restrictions.  He was also required to make payments to a Mexican corporation for the right to conduct this business in Mexico.  The Mexican corporation, Excimer Laser, Inc., is 49 percent owned by Robert and 51 percent owned by Maria.  Robert Maddox, M.D., leased office space from Excimer Laser, Inc.

### Pueblo Investment Partnership

Robert was a 29-percent general partner in Pueblo Investment Group, a TEFRA partnership.  Robert's basis for this interest was $150,000.  Pueblo Investment Group was involved in rental real estate and in oil and gas.

### Farm Rental

Petitioners had owned about 212 acres[4] of land outside El Paso.  Petitioners received a percentage of the cotton crops which were raised by a tenant farmer on this land.  The land, which was bought in 1984 or 1985, comprised three separate tracts.  A 34-acre tract, which cost $415,000, was foreclosed on in 1996.  A 35-acre tract, which cost $300,000, was foreclosed on in 1992.  A 150-acre tract, which cost $1,200,000, was also foreclosed on in 1992.  Each foreclosure resulted in an even exchange of the deed for the balance of the debt owed.

---

[4]    The acreage is taken from Ward's summary of her April 23, 1996, meeting with petitioners' representative, a stipulated exhibit.  The sum of the listed areas of the three tracts is 219 acres, not the 212-acre listed total.  Neither side has noted, much less sought to explain, this discrepancy.

Schedule A:  Charitable Contributions

Petitioners had donated $343,000 worth of computer equipment to El Paso in 1987.  The equipment was in the Curie Building when it was bought, in 1987.

Petitioners' representative told Ward there was proper documentation to verify all income and expense items shown on petitioners' 1991 and 1992 tax returns.  Ward asked for petitioners' consent to extend for 1 year the time to assess the income tax for 1991.  Petitioners' representative orally agreed to a 6-month extension.  Ward said she would prepare the Form 872 to cover the 6-month period and deliver the Form 872 to petitioners' representative's office on April 25, 1996. Petitioners' representative told Ward to call before she came to his office.

On April 22, 1996, Ward had prepared a Form 4564, Information Document Request (hereinafter sometimes referred to as an IDR) for petitioners' 1991 and 1992 tax returns.  An IDR is an informal written request for information or documents from a taxpayer.  It serves as documentation that items have been requested and provides to the taxpayer a list of items that the taxpayer is to locate.  It is not uncommon for an agent to ask for information or documents orally and follow up with a written request.  Although this IDR had been prepared for the April 23, 1996, meeting, Ward did not leave it with petitioners' representative, nor did Ward give to him any other writing

specifying for examination particular items shown on petitioners'
1991 or 1992 tax returns.

After The Meeting

On April 25, 1996, Ward prepared the Form 872 and telephoned
petitioners' representative.  She left a message at his office.
She also left messages on April 30, May 3, May 6, May 10, and May
13.  Petitioners' representative did not return these calls.

On June 20, 1996, petitioners' representative spoke with the
chief of the 90-Day Review Section.  This section chief then
directed Ward to return to petitioners' representative's office
regarding the Form 872.

On June 26, 1996, Ward went to petitioners' representative's
office with the Form 872.  Petitioner's representative refused to
sign the Form 872, saying that he was willing to consent to a
period of limitations extension if Ward limited the scope of her
examination.  Ward refused to agree to a limited-scope extension,
without discussing this with her manager.  The parties did not
extend the limitations period for 1991 or 1992, apart from the
1991 extension that had previously been agreed to in order to get
the IRS to move the audit from El Paso to Dallas.  Petitioners'
representative also stated that he had never received an IDR for
these years.  Ward offered to give to him the IDR that she had
prepared for the April 23, 1996, meeting, but petitioners'
representative refused to accept it.

The next day, June 27, 1996, respondent issued a notice of

deficiency relating to petitioners' 1991 and 1992 income tax returns.

Petitioners filed a timely petition with this Court on September 26, 1996.[5] Respondent filed a timely answer on November 21, 1996.

After respondent filed the answer, an Appeals officer and a revenue agent reviewed the substantiation documentation that petitioners' representative provided relating to the notice of deficiency adjustments. Petitioners' representative's first meeting with the Appeals Officer was on January 23, 1997. The adjustments were ultimately settled as shown in table 1 for 1991, and table 2 for 1992.

---

[5]    The postmark date is Sept. 24, 1996, the 89th day after the notice of deficiency was issued. See sec. 7502.

Table 1  (1991)

| Item | Claimed On Tax Return | Notice Def. Adjustment | Change To Adjustment Per Settlement | Net Stipulated Adjustment |
|---|---|---|---|---|
| Sched. C | | | | |
| Depreciation | $11,676 | $11,676 | ($41,233) | ($29,557) |
| Interest | 646 | 646 | (646) | -0- |
| Legal, other professional | 27,422 | 27,422 | -0- | 27,422 |
| Tax | 70,006 | 70,006 | -0- | 70,006 |
| Other deductions | 461 | -0- | -0- | -0- |
| | | | | |
| Sched. E | | | | |
| Depreciation | 373,772 | 373,772 | (373,772) | -0- |
| Interest | 569,840 | 569,840 | (569,840) | -0- |
| Casa Sabrosa | 7,971 | 7,971 | (3,533) | 4,438 |
| Maddox, M.D., P.A. | 56,248 | 56,248 | (56,248) | -0- |
| Maddox Optical | 15,249 | 15,249 | (15,249) | -0- |
| Farm rental | 24,423 | 24,423 | (24,423) | -0- |
| Other deductions | 379,766 | -0- | -0- | -0- |
| | | | | |
| Sched. A | | | | |
| Contributions | 20,575 | 20,575 | (55,844) | (35,269) |
| Real estate tax | 11,141 | | | |
| Home mtg. int. | 49,241 | | | |
| Limitation[1] | -0- | 32,952 | (32,550) | 402 |
| | | | | |
| Exemptions[1] | 8,600 | 8,600 | (8,600) | -0- |
| | | | | |
| New issues | | | | |
| Loan amortization | -0- | -0- | (68) | (68) |
| | | | | |
| Other Loss | 1,100 | -0- | -0- | -0- |
| | | | | |
| Totals | 1,628,137 | 1,219,380 | (1,182,006) | 37,374 |

_____

[1] Computational adjustments.

Table 2  (1992)

| Item | Claimed On Tax Return | Notice Def. Adjustment | Change To Adjustment Per Settlement | Net Stipulated Adjustment |
|---|---|---|---|---|
| Sale of business | $203,973 | $203,973 | ($203,973) | -0- |
| **Sched. C** | | | | |
| Depreciation | 92,353 | 92,353 | (82,611) | $9,742 |
| Interest | 32,789 | 32,789 | (32,789) | -0- |
| Legal, other professional | 40,900 | 40,900 | (40,900) | -0- |
| Mexican rights | 24,500 | 24,500 | (24,500) | -0- |
| Other deductions | 25,503 | -0- | -0- | -0- |
| **Sched. E** | | | | |
| Depreciation | 353,714 | 353,714 | (353,714) | -0- |
| Interest | 546,244 | 546,244 | (546,244) | -0- |
| Maddox, M.D., P.A. | 32,622 | 32,622 | (32,622) | -0- |
| Maddox building rental | 224,097 | 224,097 | (134,453) | 89,644 |
| Farm rental | 613,781 | 613,781 | (524,364) | 89,417 |
| Other deductions | 144,094 | -0- | -0- | -0- |
| **Sched. A** | | | | |
| Real estate tax | 6,998 | | | |
| Home mtg. int. | 47,442 | | | |
| Investment int. | 312 | | | |
| Limitation[1] | -0- | 43,536 | (43,536) | -0- |
| Exemptions[1] | 9,200 | 9,200 | (9,200) | -0- |
| ½ S.E. tax deduction[1] | -0- | (2,462) | 2,462 | -0- |
| **New issues** | | | | |
| Gross receipts | -0- | -0- | 3,440 | 3,440 |
| Loan amortization | -0- | -0- | (270) | (270) |
| Totals | 2,398,522 | 2,215,247 | (2,023,274) | 191,973 |

_____

[1] Computational adjustments.

The deductions that petitioners claimed on their tax returns exceeded the income they reported thereon by such large amounts that, even after the parties' agreements as to net adjustments for 1991 ($37,374) and 1992 ($191,973), petitioners do not have deficiencies for either year.

Petitioners' reasonable litigation costs in the instant case, including their costs of litigating their motion for award of litigation costs, are $15,000.

_____

Petitioners have exhausted the administrative remedies available to them. Petitioners have not unreasonably protracted the proceeding in this Court. Petitioners have substantially prevailed with respect to the amount in controversy. Petitioners have satisfied the applicable net worth limitation.

The position of respondent in the instant proceeding was not substantially justified.

### Discussion

The Congress has provided for the awarding of litigation costs to taxpayers in certain circumstances. Under section 7430,[6] a taxpayer who satisfies a series of requirements is

_____

[6] Sec. 7430 provides, in pertinent part, as follows:

SEC. 7430. AWARDING OF COSTS AND CERTAIN FEES.

(a) In General.--In any administrative or court proceeding which is brought by or against the United States in connection with the determination, collection, or refund of any tax, interest, or penally under this title [the Internal Revenue Code of 1986], the prevailing party may be awarded a judgment or a settlement for--

(continued...)

(1) reasonable administrative costs incurred in connection with such administrative proceeding within the Internal Revenue Service, and

(2) reasonable litigation costs incurred in connection with such court proceeding.

(b) Limitations.--

(1) Requirement that administrative remedies be exhausted.--A judgment for reasonable litigation costs shall not be awarded under subsection (a) in any court proceeding unless the court determines that the prevailing party has exhausted the administrative remedies available to such party within the Internal Revenue Service.  Any failure to agree to an extension of the time for the assessment of any tax shall not be taken into account for purposes of determining whether the prevailing party meets the requirements of the preceding sentence.

\* \* \* \* \* \* \*

(c) Definitions.--For purposes of this section--

\* \* \* \* \* \* \*

(4) Prevailing party.--

(A) In general.--The term "prevailing party" means any party in any proceeding to which subsection (a) applies \* \* \*--

(i) which--

(I) has substantially prevailed with respect to the amount in controversy, or

(II) has substantially prevailed with respect to the most significant issue or set of issues presented, and

\* \* \* \* \* \* \*

(B) Exception if United States establishes that its position was substantially justified.--

(continued...)

(i) General rule.--A party shall not be treated as the prevailing party in a proceeding to which subsection (a) applies if the United States establishes that the position of the United States in the proceeding was substantially justified.

\*      \*      \*      \*      \*      \*      \*

(C) Determination as to prevailing party.-- Any determination under this paragraph as to whether a party is a prevailing party shall be made by agreement of the parties or--

(i) in the case where the final determination with respect to the tax, interest, or penalty is made at the administrative level, by the Internal Revenue Service, or

(ii) in the case where such final determination is made by a court, the court.

(5) Administrative proceedings--The term "administrative proceeding" means any procedure or other action before the Internal Revenue Service.

(6) Court proceedings.--The term "court proceeding" means any civil action brought in a court of the United States (including the Tax Court and the United States Claims Court).

(7) Position of United States.--The term "position of the United States" means--

(A) the position taken by the United States in a judicial proceeding to which subsection (a) applies, and

(B) the position taken in an administrative proceeding to which subsection (a) applies as of the earlier of--

(i) the date of the receipt by the taxpayer of the notice of the decision of the Internal Revenue Service Office of Appeals, or

(continued...)

entitled to recover reasonable litigation costs. These requirements are in the conjunctive; i.e., a taxpayer must overcome <u>each</u> of these hurdles in order to succeed as to litigation costs. <u>Minahan v. Commissioner</u>, 88 T.C. 492, 497 (1987). Respondent concedes that petitioners have satisfied all of the requirements except for the one established by section 7430(c)(4)(B)(i), relating to whether the position of the United States was substantially justified.[7] As to this requirement, the statute provides, in effect, that respondent has the burden of proof. See, e.g., <u>Maggie Management Co. v. Commissioner</u>, 108 T.C. 430, 437-441 (1997).

Respondent contends that, as of the time respondent filed the answer, (1) it was reasonable for respondent to require petitioners to substantiate their claimed deductions, (2) petitioners had not yet provided this substantiation, and (3) thus it was reasonable at that time for respondent to take the position that petitioners were not entitled to their claimed deductions. Respondent contends--

> At the time of the Answer, respondent's administrative file reflected that respondent's Agent [Ward] was met with a set of circumstances which required prompt action and that she found herself confronted with an uncooperative representative for petitioners.[3]  *  *  *

---

[6](...continued)
> (ii) the date of the notice of deficiency.

[7]    To avoid disputes about minutiae and the potential of ongoing costs in this Court, the parties have stipulated that if we hold that petitioners are entitled to an award of litigation costs, then the amount to be awarded, "exclusive of any litigation costs that may be incurred with respect to an appeal of this case and thereafter," is $15,000.

\* \* \* \* \* \* \*

As a legal matter, the petitioners were required to substantiate the deductions claimed on their returns.  As a factual matter, the information available to respondent at the time of Answer was that, although the representative prepared petitioners' returns and was in possession of the records which he used to prepare the returns, the representative failed to communicate with the Agent in order for those records to be inspected.[5]  Respondent submits that, under these circumstances, it was reasonable for respondent to answer the case and require petitioners to submit their substantiation for review before respondent conceded the adjustments.

\* \* \* \* \* \* \*

_____

[3]  Moreover, the file reflected that, considering the circumstances, the Agent had not been unreasonable in exploring the possibility of extending the statutes of limitations.

\* \* \* \* \* \* \*

[5]  Respondent does not argue that it was unreasonable of petitioners' representative to decline to extend the statute of limitations.  Rather, it is respondent's position that the substantiation could have been provided beginning April 23, 1996, allowing consideration prior to the issuance of the statutory notice.  \* \* \*

Petitioners maintain as follows:

1.    Respondents [sic] denial of substantially all of Petitioners' deductions on their 1991 and 1992 individual income tax returns was not substantially justified because Respondent did not have a basis in both fact and law for the disallowance at the time Respondent issued the notice of deficiency or during the litigation of this case.

2.    Petitioners are entitled to an award for administrative and litigation costs [see supra note 1] under I.R.C. Section 7430 since Respondent's position was not substantially justified either when Respondent issued the notice of deficiency or during the litigation of this case.

\* \* \* \* \* \* \*

Respondent's position did not have a reasonable basis in both fact and law because Respondent had no information

about the case and had made no attempt to obtain information about the case prior to adopting the position at issue. Respondent failed to diligently investigate this case.

We agree with petitioners' conclusion.

We must identify the point at which the United States is first considered to have taken a position, and then decide whether the position, taken from that point forward was or was not substantially justified. Maggie Management Co. v. Commissioner, 108 T.C. at 442. The position of the United States is the position taken by respondent in this proceeding.

Sec. 7430 (c)(7)(A). Respondent's position is that which is set forth in the answer filed with the Court on November 21, 1996. Maggie Management Co. v. Commissioner, 108 T.C. at 442.

Substantially justified is defined as "justified to a degree that could satisfy a reasonable person" and having a "reasonable basis both in law and fact". Pierce v. Underwood, 487 U.S. 552, 565 (1988); Nalle v. Commissioner, 55 F.3d 189, 191 (5th Cir. 1995), affg. T.C. Memo. 1994-182. Respondent's position may be incorrect and yet be substantially justified "if a reasonable person could think it correct". Pierce v. Underwood, 487 U.S. at 566 n.2.

Whether respondent acted reasonably in the instant case ultimately turns on the available information which formed the basis for the position taken in the answer, as well as on any legal precedents related to the case. Nalle v. Commissioner, 55 F.3d at 191-192; Coastal Petroleum Refiners v. Commissioner, 94 T.C. 685, 688 (1990).

The fact that the Commissioner eventually loses or concedes a case does not by itself establish that the position the Commissioner took is unreasonable. Estate of Perry v. Commissioner, 931 F.2d 1044, 1046 (5th Cir. 1991) (award of litigation costs in Court of Appeals), affg. T.C. Memo. 1990-123; Swanson v. Commissioner, 106 T.C. 76, 94 (1996). It is only a factor that may be considered. Nalle v. Commissioner, 55 F.3d at 192 n.7; Estate of Perry v. Commissioner, 931 F.2d at 1046.

In determining whether respondent's position was not substantially justified, the question is whether respondent knew or should have known that the Government's position was invalid at the time that it took the position in the litigation. Nalle v. Commissioner, 55 F.3d at 191; Coastal Petroleum Refiners v. Commissioner, 94 T.C. at 689.

The instant case does not present questions as to validity of Treasury regulations or disputed interpretations of the statutes, as did, e.g., Nalle v. Commissioner, supra, and Minahan v. Commissioner, 88 T.C. 492 (1987). Rather, the instant case is based on availability of factual substantiation of claimed deductions. As of November 21, 1996, the date the answer was filed, respondent knew (1) the information that petitioners' representative had given to Ward at the April 23, 1996, meeting, (2) petitioners' representative claimed at this meeting that there was proper documentation to verify all the income and expense items shown on petitioners' tax returns for the years in issue, and (3) petitioners' representative had claimed from the

start that he had in his possession "all of the books, records, and source documents that will be necessary to complete a 1991 and 1992 examination." However, as of November 21, 1996, petitioners' representative had not shown any of this documentation to respondent.

Both sides agree that respondent's position is to be evaluated in the context of what led to the formulation of that position. See Lennox v. Commissioner, 998 F.2d 244, 247-248 (5th Cir. 1993), revg. T.C. Memo. 1992-382; Powers v. Commissioner, 100 T.C. 457, 473-474 (1993), affd. in part and revd. in part on other issues 43 F.3d 172 (5th Cir. 1995); see also Coastal Petroleum Refiners v. Commissioner, 94 T.C. at 687; Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971).

In analyzing the situation on November 21, 1996, both sides focus on the events preceding the issuance of the notice of deficiency. It may be helpful to briefly summarize the events. In October 1994, about 2 years after petitioners filed their 1991 tax return and about 1 year after petitioners filed their 1992 tax return, respondent notified petitioners that both tax returns would be examined. The next month, petitioners' representative asked respondent to change the place of audit from El Paso to Dallas. Respondent thereupon asked petitioners to extend the 1991 tax return period of limitations to June 30, 1996. Petitioners did so in late December 1994, respondent signed the extension on January 5, 1995, and respondent thereupon

transferred the administrative files to Dallas.  The administrative files were received by the Dallas IRS office on February 10, 1995--3 weeks after they were sent by the El Paso IRS office.  At this point, 16½ months remained before the expiration of the 1991 tax return limitations period.

About 10 months later, the administrative files were noticed in the bottom of a file cabinet outside the office of the acting manager of the examination group to which the matter had been sent.  Four months later the acting manager assigned the case to Ward.  At this point, less than 2½ months remained before the expiration of the 1991 tax return limitations period.  Ward moved relatively promptly.  Six days later she and petitioners' representative met to discuss the case.  For 2 hours petitioners' representative answered Ward's questions.  Ward asked for a 1-year extension of the limitations periods.  Petitioners' representative and Ward orally agreed to a 6-month extension.  Ward had prepared an IDR, and had taken it to the April 23, 1996, meeting, but did not give the IDR to petitioners' representative.  Nor did Ward give to petitioners' representative at this meeting any other writing specifying for examination particular items shown on the 1991 or 1992 tax returns.  For the next 3 weeks Ward telephoned petitioners' representative's office, but the calls were not returned.  Finally, on June 26, 1996, Ward went to petitioners' representative's office, but he said he would agree to only a restricted extension.  The next day, a notice of deficiency was issued.

When the case had been assigned to Ward, her manager instructed her to secure extensions of the limitations periods and, if she could not do so, then she was to "write-up and disallow issues and send to 90-Day."

In the notice of deficiency respondent disallowed about 75 percent of petitioners' claimed 1991 deductions, and then settled by conceding about 97 percent of the disallowance. Supra table 1.

In the notice of deficiency respondent disallowed about 92 percent of petitioners' claimed 1992 deductions, and then settled by conceding about 91 percent of the disallowance. Supra table 2.

In the footnotes in the quoted excerpts from respondent's brief, supra, respondent recognizes the concerns about the statute of limitations that led to our Court-reviewed opinion in Minahan v. Commissioner, 88 T.C. at 501-508 (1987), and to the congressional determination to embody those concerns in the last sentence of section 7430(b)(1). Yet, the record makes it plain that Ward was instructed to get an extension of the limitations period or to prepare a report disallowing deductions, leading to a notice of deficiency. That is exactly what Ward did. Even though petitioners' representative had claimed to have the substantiating documentation, Ward did not ask to see it. Ward prepared an IDR, but did not give the IDR to petitioners' representative until the day before respondent issued the notice of deficiency, and then only when prompted by petitioners'

representative. Respondent's counsel did not have anything useful to work with when filing the answer herein. But, collectively, respondent's employees were unreasonable in creating the situation that led to respondent's counsel not having the substantiation when preparing the answer. Thus, respondent's counsel may have been reasonable, but respondent was not.

Petitioners are not blameless. Petitioners' representative could have asked for an IDR or other listing of documents that respondent needed, but apparently failed to do so. He should have returned Ward's telephone calls--but the only indication in the record as to the purpose of these telephone calls is that respondent wanted a limitations extension and not that respondent wanted substantiation materials.

Petitioners' case is not as strong as that of the taxpayers in Powers v. Commissioner, supra.

The issue in Powers was whether the Commissioner's position was substantially justified where it was not based on any factual information about the taxpayer and where the Commissioner had not attempted to obtain information about the case before adopting the position. Powers v. Commissioner, 100 T.C. at 478. Specifically, this Court noted that the Commissioner's position lacked a reasonable basis in fact and law because: (1) The Commissioner made no effort to contact the taxpayer during the 3 years allowed by section 6501 to assess tax or the 3 additional years for which the taxpayer agreed to extend the period to

assess tax by signing Forms 872-A; (2) before asking the taxpayer to consent to extending the limitations period, the Commissioner had already decided to let the statute of limitations bar assessment of tax against the taxpayer if the taxpayer did not consent; (3) the Commissioner had also decided not to contact the taxpayer or examine the taxpayer's books and records; and (4) the Commissioner's counsel had prior familiarity with the taxpayer's tax returns for the years at issue which should have led him to doubt that Commissioner's position would prevail. Powers v. Commissioner, 100 T.C. at 473-474.

Powers is distinguishable from the instant case because here respondent did contact petitioners and attempt to obtain information from them about the case.

The instant case comes close to being a borderline situation. Respondent could and should have served the IDR or otherwise started the process of requesting substantiation at the April 23, 1996, meeting between Ward and petitioners' representative. Instead, Ward withheld the already-prepared IDR and did not otherwise ask for any substantiation at this meeting. Although the matter is not free from doubt, we conclude that it is more likely than not that respondent's fixation with obtaining the second extension, after having frittered away the bulk of the extension that petitioners already had granted, was the primary cause of the position respondent took in the answer. At the time of the answer, respondent did not have the substantiation because respondent had decided not to ask for the substantiation. Thus,

respondent created the very problem that respondent seeks to use as an excuse.

We conclude, and we have found, that respondent's position in the instant proceeding was not substantially justified.

To reflect the foregoing,

An appropriate order will be issued, and decision will be entered for petitioners.